**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **LAWRENCE J. WARFIELD, as the** | § | |
| **RECEIVER for RESOURCE** | § | |
| **DEVELOPMENT INTERNATIONAL,** | § | |
| | § | |
| **Plaintiff,** | § | **Civil Action No. 3:04-cv-633-R** |
| | § | |
| **vs.** | § | |
| | § | |
| **GEORGE M. CARNIE, et al.,** | § | |
| | § | |
| **Defendants.** | § | |

## MEMORANDUM OPINION

Now before the Court are Plaintiff Lawrence Warfield's Motion for Partial Summary
Judgment against Richard Danesi (both individually and d/b/a Ai-Ki International Establishment)
and Ai-Ki International Establishment (Ai-Ki) (Dkt. No. 159), Plaintiff's Motion for Partial
Summary Judgment against George Carnie (individually and d/b/a Aruca, Inc.), Lorie Sandaine, and
Randy Sandaine (Dkt. No. 224), and Defendants George Carnie (individually and d/b/a Aruca, Inc.),
Lorie Sandaine, and Randy Sandaine's Motion for Summary Judgment against Plaintiff (Dkt. No.
224). Having reviewed the motions, the related submissions, the evidence presented to the Court,
and the applicable law, the Court GRANTS the Receiver's Motions for Partial Summary Judgment
and DENIES Defendants George Carnie (individually and d/b/a Aruca, Inc.), Lorie Sandaine, and
Randy Sandaine's Motion for Summary Judgment.

## I. BACKGROUND

This case arises out of an earlier-filed lawsuit that is currently pending before this Court
entitled *SEC v. Resource Development International*, Civ. No. 3:02-cv-605-R (the RDI case). In

the RDI case, the Securities and Exchange Commission (SEC) is prosecuting several individuals and entities for allegedly operating a fraudulent "prime bank" securities scheme known as the Resource Development International Trading Program (RDI).  The SEC alleges that the RDI program functioned as a fraudulent "Ponzi scheme" and not as a legitimate investment program.  Shortly after the RDI case was filed, the Court appointed Lawrence J. Warfield to serve as Receiver for RDI and its affiliated entities.  Pursuant to the order governing his appointment, Warfield has filed this case, *Warfield v. Carnie*, to recover RDI assets that he has traced to several individuals during his investigation of how RDI's assets were disposed.

The claims at issue in the motions pending before the Court depend, in part, on the RDI program's specific characteristics and a history of the litigation.  To put these motions in perspective, the Court will briefly summarize the history of the RDI case and the context in which this case arises.

### A.     The RDI Case

The RDI program was a fraudulent prime bank financial investment program that was masterminded for over two years by David Edwards and his father, James Edwards.  The RDI program arose from an earlier Ponzi scheme known as Dennel Finance Limited (Dennel), which was created and directed by Benjamin Franklin Cook.  In March 1999, the SEC shut down the Dennel program after filing suit against Cook and his affiliates for securities fraud.  That case, *SEC v. Cook*, was also heard by this Court.[1]

---

[1]This Court also presided over the SEC's successful prosecution of the operators and facilitators of the Dennel program.  *See SEC v. Cook, et al.* (Civil No. 3:99-cv-571-R).  In addition, the Court also oversaw the appointed receiver's attempt to recover receivership assets from various defendants, participants, and other persons designated as defendants for the purpose of equitable relief.

After the Dennel program was shut-down, the Edwardses and others began selling investments in RDI, their own trading program. Acting through another entity named Pacific International Limited Partnership (PILP), the Edwardses fraudulently collected millions of dollars from investors, which they, in turn, placed with the fraudulent Dennel program. From approximately January 1999 until at least September 2001, RDI collected more than $73 million from more than 1,300 investors from at least 34 different states.

The Edwardses conducted the RDI prime bank scheme, in part, to raise money to repay certain Dennel investors, including several investors whose funds they had personally solicited. Additionally, the Edwardses used an entity they owned and controlled, Sound Financial Services, Inc., to disburse substantial amounts of RDI funds to investors in other unrelated failed ventures.

After repaying investors in both the Dennel scheme and unrelated ventures, the Edwardses continued to operate the RDI program. Like the Dennel Program, the Edwardses required more and more investors to keep the RDI scheme afloat. They and their sales people, known as facilitators, lured funds from investors by falsely promising to facilitate lucrative – yet completely secure – transactions in foreign prime bank securities. In reality, the type of investment program described to RDI investors never existed and the payments that investors received were nothing more than funds provided by new investors.

Once the Edwardses learned the SEC had shut down Dennel and was investigating the RDI program, they moved their primary accounts for the RDI program offshore to the Bank of Nevis International, Ltd. (Bank of Nevis). There, they opened offshore accounts in the name of Jade Asset Management, Inc. (Jade) and arranged for many of their RDI facilitators to also set up offshore accounts at the Bank of Nevis so that their "commissions" could be easily transferred between

accounts.  The Edwardses recruited their friend Edward Harris[2] to serve as the President of Jade and make the wire transfers of hundreds of thousands of dollars from the Bank of Nevis.

Ultimately, the RDI program became too large and collapsed when the Edwardses could no longer pay the returns that they promised to investors or the enormous commissions promised to the investment facilitators.  At first, payments to investors became sporadic, but then ceased altogether.

### B.    Warfield's Appointment as Receiver for RDI

On March 25, 2002, the Court appointed  Warfield as temporary receiver for all defendants in the RDI case.  Shortly thereafter, the Court entered a preliminary injunction that, in part, continued the RDI receivership under Warfield.  The Court's order authorizes Warfield to collect, receive, and take possession, custody, or control of RDI's assets and the assets of its affiliated entities.

To determine how receivership assets were disposed, each Defendant in the RDI case was ordered to prepare an accounting of funds paid to and received from RDI.  The Defendants who refused to comply with these directives were found to be in contempt of court and were incarcerated until they complied with the order.

Immediately after the Receiver seized the RDI office, David Edwards and Edward Harris broke into the office and removed an unknown number of boxes, thereby concealing potentially thousands of transactions, as well as the identity of persons against whom the Receivership held potential claims.

Approximately one month after his appointment, the Receiver began issuing subpoenas to

---

[2]Harris had previously helped the Edwardses collect millions of dollars from investors for the Dennel scheme through PILP.

various financial institutions to obtain records related to accounts that either transferred to or received funds from known accounts operated by the Defendants. The process is expensive, since the Receiver is required to pay each bank's expenses related to gathering and producing copies of all requested documents, but absolutely essential to discovery of persons holding receivership assets. Subpoenas were issued beginning in May 2002. As of July 7, 2005, subpoenas had been served on not less than 24 banks, 4 credit unions and 4 other types of financial institutions, related to more than 220 different accounts and approximately 1,300 investors, as well as each of the receivership entities and relief defendants. With respect to these records, the Receiver and his staff have analyzed not less than 32,500 banking transactions to determine who received fraudulent transfers in excess of any investment made in any receivership entity.

The process of reviewing the documents requires the Receiver and his staff to evaluate tens of thousands of pages of banking records to determine whether any particular account or individual received more than invested, whether the account was held in a trade name, whether the account was connected to or transacted with other, previously unknown, persons or accounts, the manner in which checks were endorsed, persons listed on signature cards, etc. Information related to every transfer to or from an account owned by a receivership entity was entered into a computer for cross-referencing with information about recipient accounts. Review of the information requires an ongoing evaluation, but nonetheless, allowed the Receiver to identify many persons who have been unjustly enriched by their receipt of receivership assets. As late as March 2004, while continuing his analysis regarding the tens of thousands of transactions between the receivership entities and third parties, the Receiver identified an additional 340 persons who received a net benefit from the receivership entities at the expense of the RDI program investors.

Through forensic accounting, the Receiver has reconstructed the RDI program's operations and determined that the organization received $73.6 million from investors.  Of this amount, approximately $31 million was paid to investors and $30.6 million was paid to facilitators. Approximately $5.3 million was used by the Edwardses to pay people who had invested with them in failed ventures preceding the RDI Trading Program.

### C.        This lawsuit: *Warfield v. Carnie, et al.* (No. 3:04-cv-633-R)

On March 25, 2004, the Receiver filed this lawsuit against defendants who, he claims, either facilitated investments in the RDI program, received transfers from the receivership entities as "repayments" for investments in unrelated payphone ventures, or otherwise received "false profits" from the receivership entities.

The Receiver alleges that, beginning in 1999, the Edwardses provided George Carnie and other Defendants with informational materials about RDI.  Carnie and other Defendants later used those materials to solicit new investors into the program.  During these solicitations, Carnie and others promised prospective investors astronomical, riskless returns on their investments in the range of 24%-120% per year.

Warfield alleges that Defendants disseminated information and solicited investors in furtherance of the RDI Ponzi scheme. He also alleges that Defendants received investor funds totaling at least $2,548,000.  Those funds allegedly constitute receivership assets which are subject to the jurisdiction and control of this Court. The Receiver seeks to recover investor monies from Defendants under theories of fraudulent transfer, conversion, civil conspiracy, breach of fiduciary duty, fraud, negligent misrepresentation, and violations of federal securities laws.

The Receiver moves for partial summary judgment against Richard Danesi (individually and d/b/a Ai-Ki International Establishment) and Ai-Ki International Establishment (the Danesi Defendants) on fraudulent transfer and unjust enrichment claims. The Receiver also moves for summary judgment on the Danesi Defendants' affirmative defenses of limitations and laches.

The Receiver moves for partial summary judgment against George Carnie (individually and d/b/a Aruca, Inc.), Lorie Sandaine, and Randy Sandaine (collectively the Carnie Defendants) on fraudulent transfer, unjust enrichment, and alter ego claims.  In addition, the Receiver also moves for summary judgment on the Carnie Defendants' affirmative defenses of statutes of limitations, waiver, estoppel, ratification, fraudulent inducement, negligence, set-off, proportionate responsibility, and absence of an indispensable party.  The Carnie Defendants have filed a cross motion for summary judgment on their claim that the Receiver's action is barred by limitations and that the payments made by the receivership entities to the Carnies and Sandaines were taken in good faith and for reasonably equivalent value**.**

### D.     Undisputed Facts

#### 1.        The Danesi Defendants

In February 1999, Danesi traveled to Liechtenstein and formed Ai-Ki.  Danesi admits that he had sole, exclusive control over Ai-Ki and that there was "no stock or anything like that in the corporation."  As the company's president, Danesi had the authority to transfer assets from Ai-Ki.

By his own admission, Danesi served as an "intermediary" for the RDI program, connecting people who had money with people who were interested in using the money for a "best efforts program."  It was in this capacity that he approached David Edwards in the summer of 1999 about

an investment opportunity.  According to Danesi, he and Edwards negotiated for Edwards to transfer funds to him for investment.  By mid-July 1999, he and Edwards had executed various agreements to this effect, which authorized Danesi to invest the money that Edwards agreed to send him.  Danesi maintains that one of his agreements with Edwards permitted him to pay his travel expenses and administrative services from the money invested.

In reality, Danesi conned the Edwardses into believing that he was promoting a legitimate investment program.  Danesi admits that he never had personal knowledge of the legality or legitimacy of any program that he promoted to prospective investors.  He also admits that he did not conduct any due diligence on any of these programs to determine whether they were legitimate investment opportunities.

The Danesi Defendants received a considerable amount of assets from RDI for investment in the program that Danesi had marketed to the Edwardses.  Danesi and Ai-Ki admit that on July 22, 1999, they received a $300,000 wire transfer into Ai-Ki's account at LGT Bank in Liechtenstein from RDI's U.S. Bank account in Carson City, Nevada.  However, this money was not invested as promised.  Instead, Ai-Ki, through Danesi, transferred the money into another account under Danesi's control in The Netherlands.

The evidence submitted to the Court further reveals that Danesi received an additional $2,500,000 through two subsequent transfers from RDI.  The first transfer occurred on September 27, 1999.  On that day, Jade transferred $1,000,000 from its Bank of Nevis account to Danesi's ABN-Amro account. The second transfer occurred on November 12, 1999.  That day, Jade transferred an additional $1,500,000 from its Bank of Nevis account to Danesi's ABN-Amro account.

8

After these transfers were made, Danesi represented to RDI and Jade that the money had been invested and had earned as much as 182% in returns, even though he never made any investment with the funds that were entrusted to him. In December 1999, Danesi remitted $999,984.50 in illusory "returns" from his ABN-Amro account to Jade's account at the Bank of Nevis. Danesi did not remit any further funds to RDI, leaving him in possession of a net amount of $1,800,015.50 in receivership assets.

### 2.    The Carnie Defendants: George Carnie (individually and d/b/a Aruca, Inc.), Lorie Sandaine, and Randy Sandaine

Sometime in early 1998, George Carnie approached Larry Johnson, a facilitator of the Dennel scheme, for investment advice.  Johnson recommended PILP as a lucrative opportunity and spoke to Carnie at length about the program.  Johnson also provided Carnie with a standardized packet of contract forms that he needed to complete before making the investment.  Although Carnie claims that he conducted his own independent research into the Edwardses and PILP, he maintains that he never understood how the investment program worked. Nevertheless, Carnie made an initial investment of $150,000 into PILP in May 1998, and made several additional investments into the program over a span of two years.  Carnie's daughter, Laurie Sandaine, also invested $120,000 in PILP in 1998.[3]

As stated previously, PILP operated in conjunction with Dennel until the SEC shut down the

---

[3] Like her father, Lorie Sandaine also met with Johnson and completed the standardized documentation for her $120,000 investment in PILP.  She claims to have included her husband's name on the documents because Washington is a community property state. Her father arranged for a wire transfer of $120,000 to PILP through an intermediary trust established on behalf Laurie Sandaine and her husband, Randy Sandaine.  According to the Carnie Defendants, this investment was an early payout on property that both families owned jointly and intended to sell.

Dennel program in March 1999.  Accounting records corroborate this and reveal that the investments made by the Carnies and Sandaines before March 1999 were forwarded to Dennel.  Those records also reveal that Carnie and the Sandaines received substantial monetary distributions from Dennel through PILP as returns on their investments.

Carnie continued investing with the Edwardses even after Dennel was shut down.  The Edwards's new program, RDI, required investors to establish offshore accounts as repositories for monetary transfers.  Consequently, Carnie (with Johnson's assistance) formed an offshore corporation named Aruca, Inc., in the State of Nevis, the Federation of Saint Kitts and Nevis.  Carnie then opened two bank accounts in Aruca's name at the Bank of Nevis.  Records from the Bank of Nevis reveal that Aruca received assets from Jade (as "returns" on Carnie's RDI investments) and from an offshore corporation named Kelp.

By his own admission, Carnie claimed only a 9% interest in Aruca "for tax purposes," but asserts that he was the only owner of Aruca that ever deposited or received money from Aruca's bank accounts.  Records from the Bank of Nevis confirm that Carnie exercised total control over all assets that Aruca received.

Meanwhile, Carnie set up a Nevada corporation called Roja, Inc., in order to receive assets from Aruca.  Carnie and his wife, Deanna Carnie, were the only signatories on Roja's bank accounts.  Carnie admits that one of the reasons for establishing Roja was to protect his assets from lawsuits.  Aruca's bank records reveal that Carnie did in fact transfer assets from Aruca to Roja.

After conducting a comprehensive forensic accounting of financial records made available to him, the Receiver and his accountants have concluded that George and Deanna Carnie invested $1,145,000 into the RDI program through various receivership entities and received a total return

10

of $2,262,761.33. Additionally, the Receiver has found that the Sandaines received $184,000 from

Receivership entities even though they never personally invested anything in the RDI program.

Based on these figures, the Receiver contends that the Carnies received $1,117,761.33 in excess of

their RDI investments, and the Sandaines received $184,000, despite having never made a single

investment in RDI or any affiliated entity.


## II. ANALYSIS

### A.        Summary Judgment Standard

"Summary judgment procedure is properly regarded not as a disfavored procedural shortcut,

but rather as an integral part of the Federal Rules as a whole which are designed 'to secure the just,

speedy and inexpensive determination of every action.'"  *Celotex Corp. v. Catrett*, 477 U.S. 317,

327 (1986) (citing Fed. R. Civ. P. 1).  Summary judgment under Rule 56(c) of the Federal Rules of

Civil Procedure is appropriate when there is no genuine issue as to any material fact in the case and

the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); *Celotex Corp.,*

477 U.S. at 322; *Melton v. Teachers Ins. & Annuity Ass'n of Am.*, 114 F.3d 557, 559 (5th Cir. 1997).


The party moving for summary judgment bears the initial burden of identifying those

portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together

with affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.

*Celotex*, 477 U.S. at 323; *Calbillo v. Cavender Oldsmobile,* 288 F.3d 721, 725 (5th Cir. 2002).

Where the nonmovant bears the burden of proof on a claim upon which summary judgment is

sought, the movant may also discharge its initial burden by showing that there is an absence of

evidence to support the nonmoving party's case.  *See Celotex*, 477 U.S. at 325.  Once the movant has

met its initial burden, the nonmovant must set forth specific facts, by affidavits or otherwise,

showing that there is a genuine issue for trial.  *See Matsushita Elec. Indus. Co. v. Zenith Radio

Corp.*, 475 U.S. 574, 587 (1986).  To avoid summary judgment, the non-moving party "must do

more than show that there is some metaphysical doubt as to the material facts."  *Id.* at 586.  "If the

evidence [proffered by the nonmovant] is merely colorable, or is not significantly probative,

summary judgment may be granted."  *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 249-50 (1986).

On the other hand, the evidence of the nonmovant must be believed and all justifiable inferences

must be drawn in its favor.  *See id.* at 255 (1986).

### B.      Choice of Law

The Court must first resolve a choice of law dispute before proceeding to the merits of the

Receiver's claims.  The Receiver contends that Washington law governs this lawsuit since federal

choice of law rules apply and, under those rules, Washington is "the state with the most significant

relationship to the occurrence and the parties."  By contrast, the Danesi Defendants argue that Texas

choice of law rules apply and would show that the law of either Liechtenstein or The Netherlands

applies to the Receiver's suit against them.[4]

As a threshold matter, the Court recognizes that it has supplemental jurisdiction over the

Receiver's pendent state law claims under the Uniform Fraudulent Transfer Act and for unjust

enrichment.  *See* 28 U.S.C. § 1367.  A federal court exercising pendent jurisdiction over state law

claims must apply the substantive law of the state in which it sits. *Sommers Drug Stores Co.*

---

[4]The Carnie Defendants do not object to Washington law as the applicable law governing the Receiver's claims.

*Employee Profit Sharing Trust v. Corrigan*, 883 F.2d 345, 353 (5th Cir. 1989) (citing *United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966) and *Erie R.R Co. v. Tompkins*, 304 U.S. 64 (1938)). The forum state's choice of law rules are included within this directive. *Corrigan*, 883 F.2d at 353. Consequently, the Court will apply Texas choice of law rules to determine which law applies to the Receiver's fraudulent transfer and unjust enrichment claims.

To resolve choice-of-law questions, Texas courts apply the rules of the Restatement (Second) of Conflict of Laws. *Duncan v. Cessna Aircraft Co.*, 665 S.W.2d 414, 420-21 (Tex. 1984). The particular application of the Restatement's choice of law rules depends on the nature of the claims at issue. *See SnyderGeneral Corp. v. Great American Ins. Co.*, 928 F. Supp. 674, 677 (N.D. Tex. 1996). The Receiver's fraudulent transfer claims sound in tort. *See, e.g.,Terry v. June*, 420 F. Supp. 2d 493, 503 (W.D. Va. 2006) (receiver's fraudulent conveyance claim sounded in tort and, therefore, would be governed by the test embodying the Restatement's general approach to tort claims); *SEC v. Infinity Group*, 27 F. Supp. 2d 559, 564 (E.D. Pa. 1998) (holding same), *aff'd*, 212 F.3d 180 (3d Cir. 2000).

Section 145 of the Restatement governs choice of law disputes in tort actions. Under §145, the local law of the state which has the "most significant relationship to the occurrence and the parties" will govern the claim. Restatement (Second) Conflict of Laws §145(1) (1971); *Duncan,* 665 S.W.2d at 421.

The following factors are relevant to this inquiry: (1) the place where the injury occurred; (2) the place where the conduct causing the injury occurred; (3) the domicile, residence, nationality, place of incorporation, and place of business of the parties; and (4) the place where the relationship between the parties is centered. Restatement (Second) Conflict of Laws §145(2). Additional factors

that should also be considered in cases like this one, which involve an alleged fraud or misrepresentation, are the place where the defendant made the representations; the domicile, residence, nationality, place of incorporation, and place of business of the parties; and the place where a tangible thing which is the subject of the transaction between the parties was situated at the time.  Restatement (Second) Conflict of Laws §148.

Under this analysis, the Court concludes that Washington is the state with the most substantial relationship to the parties and the alleged fraudulent transfers of receivership assets.  RDI and several of its affiliates (e.g., Jade, Sound Financial Services, and IERC) had their principle places of business in Washington.  In fact, all of RDI's business was conducted from its Tacoma office.  By implication, RDI bore its "injuries" from the fraudulent transfers in Washington more so than in any other state.  Moreover, to the extent that receivership assets were ordered transferred out of RDI and its affiliates, those decisions – and, hence, the "conduct" causing injury – occurred in Washington at the direction of James and David Edwards, both of whom were residents of Washington at the time.

Although the Court is aware that the RDI fraud ensnared over 1,300 investors from at least 34 states, those individuals are not parties to this action.  Rather, RDI – through Warfield – is the plaintiff.  In any event, even if the Court were to consider the myriad domiciles of the RDI investors as relevant to its analysis under §145, Washington State, in the aggregate, nevertheless has more relevance to the Receiver's fraudulent transfer claims since every investor's relationship was "centered" in Washington.  Washington State is where RDI prospectuses and solicitations originated; where investors sent their completed applications to participate in the RDI program; where they sent their money; and where their investment contracts were executed. Washington

14

addresses also appeared on all preprinted letterhead that the Receiver has discovered.  For these reasons, the Court concludes that Washington law should govern the Receiver's fraudulent transfer claim.

The Danesi Defendants claim that the laws of Liechtenstein or The Netherlands  should apply to this controversy since most, if not all, of the events giving rise to the Receiver's claim against the Danesi Defendants occurred in those countries, far "beyond the borders of the United States."  Because the Receiver has not relied on that law in his motion, they argue, summary judgment is inappropriate since "the Receiver has not proven his case as a matter of law."

Danesi's arguments fail for two principal reasons.  First, as demonstrated above, foreign law does not control the Receiver's claims since those jurisdictions do not have the "most substantial relationship" to the occurrence and the parties; rather, Washington law does. The masterminds behind RDI and the other receivership entities, David and James Edwards, lived in Washington State.  RDI was a Nevada corporation with its principal place of business in Tacoma, Washington. Jade Asset Management, Ltd., also operated from Tacoma and was capitalized entirely by assets from the various receivership entities that the Edwardses controlled.   To the extent that the receivership entities executed contracts or made monetary transfers to Danesi or Ai-Ki, they did so from Washington State while under the control of Washington residents.  In light of these substantial connections to Washington State, it does not matter that the funds were transferred overseas.

Second, and more significantly, Danesi has not provided any evidence (admissible or not) of his location or domicile while he directed the transfers between RDI and the European bank accounts he controlled.  Instead, Danesi and Ai-Ki have submitted hundreds of pages of foreign bank statements to prove that the transactions "occurred" abroad.  However, they have not attempted to

translate, much less summarize, those documents from German. Instead of showing how the documents prove that the transactions "occurred" abroad, the Danesi Defendants seem to expect that the Court will be moved to that conclusion by the *gestalt* of this massive document dump. The Court is not so easily swayed. Merely proving that money was received abroad into foreign bank accounts does not prove that the transaction "occurred" abroad for purposes of the Restatement or the Uniform Fraudulent Transfer Act.

### C.      The Uniform Fraudulent Transfer Act

Washington has enacted the Uniform Fraudulent Transfer Act (UFTA). *See* Wash. Rev. Code §§19.40.041, *et seq*. (2005). Under the UFTA, a defrauded creditor may recover amounts transferred from a debtor if the creditor can prove that the debtor made a fraudulent transfer of assets[5] and the transferee is not entitled to claim a statutory defense[6] from liability. To recover under the theory of actual fraud, the creditor must show that the "debtor" made a particular transfer "[w]ith actual intent to hinder, delay, or defraud any creditor." *Id.* at §19.40.041(a)(1); *see also*, *Sedwick v. Gwinn*, 873 P.2d 528 (Wash. Ct. App. 1994).[7]

If the creditor successfully proves that a transfer was made with actual intent to defraud, then

---

[5] A transfer may be actually fraudulent or constructively fraudulent to the debtor's creditors. *See* Wash. Rev. Code §§19.40.041(a)(1) (actual fraud) & (a)(2) (constructive fraud). Here, the Receiver alleges that the transfers made from the receivership entities were made with actual intent to defraud the creditors of those entities – e.g., the investors. For that reason, the Court will not analyze whether the transfers were also constructively fraudulent as to those creditors.

[6] *See* Wash. Rev. Code §§19.40.041, 19.40.081.

[7] The Receiver correctly notes that the UFTA is modeled on §548(a)(1) of the Bankruptcy Code, and therefore, cases interpreting §548(a)(1) may also be used to interpret the UFTA. *See Warfield v. Byron*, 436 F.3d 551, 558 (5th Cir. 2006) (finding that Washington's UFTA was "virtually identical" to 11 U.S.C. §548 and that cases interpreting §548 are consistent with Washington law).

the transferee may avoid liability by proving that he or she acted in "good faith" *and* exchanged "reasonably equivalent value" for the transfer. Wash. Rev. Code §19.40.081; *In re Agricultural Research and Tech. Group, Inc.*, 916 F.2d at 535.

A receiver of an alleged Ponzi scheme may sue under the UFTA to recover funds paid from the entity in receivership. *See, e.g., Scholes v. Lehmann*, 56 F.3d 750 (7th Cir.1995); *In re Rodriguez*, 209 B.R. 424, 433 (Bankr. S.D. Tex. 1997); *In re Randy*, 189 B.R. 425, 438-39 (Bankr. N.D. Ill. 1995).

The Receiver now moves for summary judgment on his fraudulent transfer claims against the Defendants.  The Receiver contends that he is entitled to summary judgment since the evidence conclusively demonstrates that (1) the transfers from the receivership entities to Defendants were made with "actual intent to hinder, delay, or defraud . . . creditor[s]" of the receivership entities; (2) Defendants received those transfers; and (3) Defendants did not exchange reasonably equivalent value for the amounts that the Receiver seeks to recover.


1.    **Actual Fraud**

The Receiver contends that RDI and its affiliated entities were Ponzi schemes, insolvent from inception, and, therefore, any transfers made from those entities were made with actual intent to defraud.  Under the UFTA, a debtor's actual intent to hinder, delay, or defraud is conclusively established by proving that the debtor operated as a Ponzi scheme.  *See Warfield v. Byron*, 436 F.3d 551, 558 (5th Cir. 2006) (citing *Cunningham v. Brown*, 265 U.S. 1 (1924)) (applying Washington law); *SEC v. Cook*, 2001 WL 256172 *3 (N.D. Tex. 2001)(Buchmeyer, J.) (citing *In re Independent Clearing House Co.*, 77 B.R. 843 (Bankr. D. Utah 1987)).  The Ninth Circuit and other courts have

held similarly.  *See In re Agricultural Research & Tech. Group*, 916 F.2d 528, 536 (9th Cir. 1990)

(interpreting §548(a)(1) of the Bankruptcy Code); *In re Cohen*, 199 B.R. 709, 717 (9th Cir. B.A.P.

1996) ("Proof of a Ponzi scheme is sufficient to establish the Ponzi operator's actual intent to hinder,

delay, or defraud creditors for purposes of actually fraudulent transfers . . . ."); *In re M&L Business*

*Machine Co.*, 59 F.3d 1078, 1079-80 (10th Cir. 1995); *Scholes v. Lehmann*, 56 F.3d 750, 757 (7th

Cir. 1995); *In re Slatkin*, 310 B.R. 740, 748-49 (Bankr. C.D. Cal. 2004).

### a.    Ponzi Schemes in General

A "Ponzi scheme" is a term generally used to describe an investment scheme that is not

supported by any underlying business venture or investment opportunity but that has the illusion of

profitability in order to recruit more investors and to sustain the program for the benefit of its

operators.  The operators induce investors into the program by promising exorbitant, unrealistic

returns on their principal investments through lucrative investment opportunities or business

ventures that often do not exist. *See In re M&L Business Machine Co.*, 59 F.3d 1078, 1080 (10th Cir.

1995).  Typically, the initial investors of the program are paid the promised returns from either the

principal investments of new investors or their own principal investments.  *In re United Energy*

*Corp.*, 944 F.2d 589, 590 n.1 (9th Cir. 1991).

By structuring distributions in this manner, Ponzi scheme operators create the perception that

their alleged investment opportunity is profitable.  This, in turn, attracts new investors into the

program.  The program then cascades into a massive sham, as returns paid to investors are financed

not through the success of any underlying business venture (if any venture exists at all), but instead

from the principal sums of newly attracted investors. *In re Hedged-Investments Associates, Inc.*, 48

F.3d 470, 471 n. 2 (10th Cir. 1995)

For that reason, a Ponzi scheme operator who transfers incoming funds to prior investors and brokers in furtherance of the illicit scheme makes such transfers with the actual intent to hinder, delay or defraud later investors and creditors.  *Cook*, 2001 WL 256172 at *3.

### b.      The RDI Trading Program was a Ponzi Scheme

As explained below, the summary judgment evidence presented to the Court overwhelmingly establishes that RDI and its affiliated entities in receivership were nothing more than elaborate Ponzi schemes. The Danesi Defendants concede that RDI was operated as a Ponzi scheme, while the Carnies Defendants all but concede the issue by not explicitly addressing it.  As Receiver, Warfield qualifies as RDI's custodian of records and is competent to testify about its business operations.  *See Byron*, 436 F.3d at 559 (citing *United States v. Jones*, 554 F.2d 251, 252 (5th Cir. 1977)).  Through a forensic accounting of those business records and other records obtained from third party individuals and financial institutions, Warfield and his accountants have discovered that the receivership entities did not make any real investments with the money that flowed into the RDI program. Instead, interest payments and profit distributions paid to investors were wholly funded by new principal investments into the program.

Warfield has also discovered that many of the documents that were used in the day-to-day operation of the RDI program were the same materials that were used in the Dennel program, another Ponzi scheme.  Those documents include promotional materials, application forms, prospectuses, and sham security certificates.

The close affiliation between RDI and Dennel also tends to prove that the RDI program was

19

a Ponzi scheme.  Operators of the RDI program began operating the program as soon as the SEC shut down the Dennel program.  As in the Dennel scheme, RDI's promotional materials solicited hundreds of prospective investors with promises of riskless high returns. Many of the promotional documents guaranteed that participants would receive *monthly* interest payments of 4% on their investments (equivalent to a 60% annual rate of return), a patently unrealistic rate of return for a legitimate investment program.

Like most Ponzi schemes, RDI's operational materials were replete with false statements and financial inaccuracies designed to prey on less sophisticated investors.  For example, new investors were advised to "pool" their investments into RDI with other people's investments as if such a strategy would minimize their overall risk exposure in that lone investment.  In reality, the aggregation of those investments was necessary to sustain the program since every new investment served as the source of monthly interest payments for a preceding investment.  RDI's issuance of false securities and financial statements also indicates that it was operated as a Ponzi scheme.

The payments received by the Carnie Defendants and the Danesi Defendants were made in furtherance of the Ponzi scheme.  The payments made to the Carnie Defendants qualified as either returns on their investments or commission payments in return for recruiting new investors into the program.  Similarly, the transfer of funds from RDI and Jade to Danesi and Ai-Ki were in furtherance of the Ponzi scheme since those transfers were intended to be an investment of RDI funds into the scheme that Danesi was fraudulently marketing to David Edwards – a proprietary investment that Edwards entered into to enrich RDI's funds (or to at least sustain the program for the time being). Consequently, the Court finds that the transfers of RDI funds made to Defendants were fraudulent transfers under the UFTA. Wash. Rev. Code §19.40.041(a)(1).

In light of the above, the Court finds that RDI and its affiliates operated as a fraudulent Ponzi scheme, which, by law, was insolvent from inception.  Therefore, all payments made in furtherance of the scheme were, as a matter of law,  made with actual intent to hinder, delay or defraud RDI's creditors.

**2.      The Carnie and Danesi Defendants received Receivership assets in excess of any investment in RDI.**

The undisputed evidence, as set forth in Kurt Heinzel's affidavit, establishes that the Danesi Defendants received a total net amount of $1,800,015.50 from RDI and its affiliated entities.  Of that amount, both Danesi and Ai-Ki received $300,000, jointly and severally, while Danesi himself received the remaining $1,500,015.50.  Likewise, the  undisputed evidence reveals that the Carnies and Sandaines received a net amount of $1,117,761.33 and $184,000, respectively, from RDI after it began to exist independently of Dennel.

Although Defendants claim that they provided reasonably equivalent value for the funds they received in excess of their initial investments in the Ponzi scheme, these claims are not supported in law or evidence before the Court.

**3.      UFTA Good Faith Defense**

The parties dispute whether Defendants are entitled to avoid liability for any fraudulent transfers received.  Under the UFTA, a transferee may avoid liability for a fraudulent transfer made with actual fraudulent intent if he or she (1) acted in good faith *and* (2) gave reasonably equivalent

value in exchange for the transfer.  *See* Wash. Rev. Code §19.40.081.[8]  Therefore, under §19.40.081, the mere fact that the transferee acted in good faith, without any intent to assist the debtor to defraud or evade creditors, is insufficient to relieve the transferee of liability if the transfer was exchanged for less than reasonably equivalent value.[9]

The Receiver contends that both groups of defendants cannot avoid liability under the UFTA since they cannot produce any evidence that they exchanged reasonably equivalent value for the amounts that he seeks to recover.  As the Receiver correctly notes, a Ponzi scheme investor who receives an amount in excess of his or her initial investment has received two types of payments – (1) a full return of the principal investment and (2) amounts received in excess of the initial investment, i.e., "fictitious profits."   The vast majority of courts that have considered the issue have held that a debtor does not receive reasonably equivalent value for any payments made to investors that represent false profits.  *See In re Hedged-Investors Associates, Inc.*, 84 F.3d 1286, 1290 (10th Cir. 1996); *Scholes v. Lehmann*, 56 F.3d 750, 757-58 (7th Cir.); *In re Taubman*, 160 B.R. 964, 967 (Bankr. S.D. Ohio 1993); *Eby v. Ashley*, 1 F.2d 971, 973 (4th Cir. 1924).

        a.        **The Carnie Defendants did not exchange reasonably equivalent value for the amounts that the Receiver seeks to recover**.

With respect to the Carnie Defendants, the Receiver argues that, as a matter of law, the transfers he seeks to recover were not made in exchange for reasonably equivalent value since he

---

[8] This is because liability is imposed on a transferee of a transfer made with actual fraudulent intent only if the transfer is "voidable." Wash. Rev. Code §19.40.081.  A transfer made with actual fraudulent intent is not voidable if the transferee took in good faith and gave reasonably equivalent value to the debtor. *Id.*

[9] A good faith transferee will, however, be entitled to a reduction of liability to the extent of any value given. *See* Wash. Rev. Code §19.40.081(d).

only seeks to recover amounts that they received in excess of their principal investments.

By contrast, the Carnie Defendants[10] argue that they exchanged reasonably equivalent value for their profits by loaning money to the receivership entities under a contractual agreement, i.e. they are entitled to some amount of return for the use of their money.

First, the Carnie Defendants' arguments fail because an illegal contract is void; it creates no legal entitlement to profits or interest. *See In re United Energy Corp.,* 944 F.2d 589, 595 (9th Cir. 1991). Therefore, investors in illegal Ponzi schemes have only provided reasonably equivalent value up to the portion of their actual investment in the scheme. The false profits they may have gained from the illegal scheme are not reasonably equivalent value. *Id.*

Second, the Carnie Defendants' investments in the Ponzi scheme were not loans. Instead, even if the Carnie Defendants relied in good faith on the investment contracts with the receivership entities, they were investment contracts as opposed to loans. The Carnie Defendants invested in alleged securities with the hope of reaping a profit rather than providing a loan with an entitlement to some kind of return. *See e.g. State v. Phillips,* 741 P.2d 24, 28-29 (Wash. 1987).

Because the Carnie Defendants could have no reasonable expectation of profiting from an illegal Ponzi scheme, and because they profited from an illegal contract, the Carnie Defendants did not exchange reasonably equivalent value for their profits. The Court finds that the Carnie Defendants did not provide any evidence that they conferred reasonably equivalent value in exchange for the money they received from the receivership entities  in excess of their initial

---

[10]The Court finds it unnecessary to reach the issue of whether Aruca or Roja were alter egos of the Carnies. Under UFTA, subsequent transferees are liable for fraudulent transfers on the same grounds as initial transferees. Wash. Rev. Code. § 19.40.081(b). Carnie admitted that he maintained control over all assets transferred to Aruca and to Roja. The Carnies were the only signatories on Aruca's account with the Bank of Nevis. Therefore, the receivership assets transferred to Carnie through Aruca or Roja were transfers to Carnie for the purposes of UFTA.

investments.

> **b.    The Danesi Defendants did not exchange reasonably equivalent value for the $1.8 million that they received from RDI and Jade**.

The Receiver alleges that the Danesi Defendants have not produced any evidence that they exchanged reasonably equivalent value with RDI or any other receivership entity for the $1.8 million they received.  As proof, the Receiver points to Ai-Ki's own admission that it did not confer any value upon any receivership entity in return for the assets it received.  Additionally, the Receiver notes that although Danesi claims to have provided "administrative services" to RDI in exchange for the money he was paid, Danesi provides no evidence of the value of those services, much less an explanation of the types of services that he claims to have rendered.   For these reasons, the Receiver argues that Danesi's claim that he conferred reasonably equivalent value is a mere conclusory allegation and cannot suffice as summary judgment evidence.

The Court finds that the Danesi Defendants failed to provide any evidence that they conferred reasonably equivalent value on RDI or any other Receivership Entity in exchange for the money transferred to them.  Danesi's claim that he provided "administrative services" to the Receivership Entities is a bald statement unsupported by any specific evidence.

The Court finds that, even after viewing the evidence in the light most favorable to the defendants, no defendant has produced any evidence that he or she exchanged reasonably equivalent value in exchange for the amounts that Warfield seeks to recover.  The Carnie and Danesi Defendants have failed to meet their burden to show that they exchanged reasonably equivalent value, an essential element of the good faith defense.  Consequently, the Court finds that no genuine issue of material fact exists on whether the Defendants exchanged reasonably equivalent value with

respect to the amounts that the Receiver seeks to recover.  As a matter of law, they did not.

Having concluded that neither the Carnie Defendants nor the Danesi Defendants have shown any legal basis for the Court to reject the Receiver's claim for summary judgment on his UFTA claim, the Court now finds that the Receiver is entitled to summary judgment on his fraudulent transfer claims.

### D.    Statute of Limitations

Under the UFTA, a fraudulent transfer claim is "extinguished" if not brought "within four years of the allegedly fraudulent transfer or, *if later*, within one year after the transfer or obligation was or could reasonably have been discovered by the claimant."  Wash. Rev. Code §19.40.091 (emphasis added). With respect to the latter portion of the statute, the Washington Supreme Court has held that §19.40.091 requires a fraudulent transfer claim be filed within one year after the "*fraudulent nature*" of the transfer is discovered – i.e., "[when] all the elements of the cause of action for fraud are discovered or should have been discovered."  *Freitag v. McGhie*, 947 P.2d 1186, 1190 (Wash. 1997) (emphasis added).  Therefore, the statute of limitations does not begin to run when the mere transfer itself is discovered.[11]  Instead, a claim under §19.40.091 accrues upon

---

[11] The Carnie Defendants contend that the Court should follow the holding of *McMaster v. Farmer*, 886 P.2d 240, 242 (Wash. Ct. App. 1994), in which the Washington Court of Appeals interpreted the "extinguishment provision" of §19.40.091 as a four-year statute of repose, to which equitable tolling doctrines do not apply.  The Court declines to do so.  As the Receiver correctly notes in his reply brief, the Washington Supreme Court in *Freitag v. McGhie*,  947 P.2d 1186 (Wash. 1997), expressly overruled *McMaster* to the extent that *McMaster* had held that the UFTA claim must be commenced within one year of the discovery of the relevant transfer itself and not the discovery of its "fraudulent nature."  *Freitag*, 947 P.2d at 1188 (citing *McMaster*, 886 P.2d at 240).  In *Freitag*, the Washington Supreme Court found that the UFTA, as codified in §19.40.091, had incorporated the common law discovery rule into the statute of limitations.  *See id.* at 1189.  The court explicitly overruled *McMaster* and rejected the notion that a claim must be filed within one year of the discovery of the transfer itself and not its fraudulent nature. As the court explained, "[c]ommon sense and the statutory purpose of the UFTA necessitate a finding that the statute begins to run with the discovery of the fraudulent nature of the conveyance."  *Id.*

discovery of the fraudulent nature of the conveyance.[12]  *Id.* at 1189.

The Receiver has moved for summary judgment on the Defendants' statute-of-limitations defenses.  He argues that his claims are timely for two reasons: first, the doctrine of adverse domination tolled the limitations period on his claims until the date of his appointment as Receiver, at which time RDI and its affiliated entities were no longer controlled by the Edwardses.  Second, he contends that the discovery rule and the doctrine of fraudulent concealment further tolled the relevant statutes of limitations until at least February 4, 2004, for the Carnie Defendants and March 18, 2004, for the Danesi Defendants. On those dates, Warfield alleges that he and his staff obtained sufficient information about the transfers and investments made between the Defendants and RDI to determine if the transfers received had been fraudulent.  Prior to then, he argues that he could not determine whether the "net effect" of the transfers between Defendants and RDI were harmful – i.e., whether the transfers at issue were "fraudulent" transfers. Because he filed his claims within one year of those dates, Warfield argues that his claims are timely under the one-year provision of Wash. Rev. Code §19.40.091.[13]

By contrast, both the Carnie Defendants and the Danesi Defendants maintain that the Receiver's claims are barred.  The Carnie Defendants argue that the Receiver's UFTA claim is barred because "the undisputed evidence establishes that the Receiver, Receivership Entities, and their creditors were actually aware of the basic facts giving rise to such claims more than a year

---

[12]Under Washington law, the statute of limitations for a claim begins to run when the claim has "accrued." Wash Rev. Code §4.16.005; *Malnar v. Carlson*, 910 P.2d 455 (Wash. 1996).  A claim is said to "accrue" when a party has the right to enforce the cause of action and seek relief in the courts.  *Gunnier v. Yakima Heart Center*, 953 P.2d 1162 (Wash. 1998).

[13]The Receiver filed his lawsuit against the Carnies and the Sandaines on June 29, 2004, and October 6, 2004, respectively, both of which were within one year of the alleged February 4, 2004, accrual date.  Likewise, the Receiver filed his lawsuit against the Danesi Defendants on March 25, 2004, only days after the alleged March 18, 2004, accrual date.

before the suit was commenced."  As proof, they note that Warfield, while serving as the receiver in the Dennel case, knew of the Edwardses' activities; knew that RDI and its affiliated entities operated as Ponzi schemes; knew that the Edwardses were operating PILP, the largest investor in the Dennel program; and knew that the Carnies were two of approximately one hundred individual investors who had invested in PILP.  They emphasize that Warfield even asked about their PILP investments while deposing David Edwards in the Dennel case  and even admitted to sending them a letter on April 12, 2000.  Although they maintain that they never received Warfield's letter, the Carnie Defendants argue that the letter and Warfield's possession of contract documents, letters, and checks in the name of RDI proves that he knew that transfers were being made to them by no later than April 2000.  For that reason, they argue, this Receiver's lawsuit is untimely.

Upon closer inspection of the evidence, the Court concludes that the Carnies have failed to present a genuine issue of material fact that limitations bars the Receiver's UFTA claims against them.

The Danesi Defendants also claim that the Receiver's claims are barred, but for different reasons. The Danesi Defendants argue (rather unpersuasively) that the Receiver's motion is incorrectly premised on United States law, which, they argue, does not apply to an overseas transaction. Again, this argument fails based on the Court's choice of law analysis.

### 1.      Equitable Tolling

The Receiver argues that limitations does not bar summary judgment relief because limitations was tolled by various equitable tolling doctrines.  He argues that equitable doctrines tolled the statute of limitations on his claims until, at the earliest, February 4, 2004, for the Carnie

Defendants and March 18, 2004, for the Danesi Defendants. In determining whether limitations was equitably tolled here, the Court will look to Washington law for the applicable statute of limitations period and tolling provisions. *See Walker v. Armco Steel Corp.*, 446 U.S. 740, 746 (1980).

### 2.    Adverse Domination

The Receiver asserts that the doctrine of adverse domination tolled the statute of limitations until at least March 25, 2002, the date of his appointment in the RDI case. Under the common law doctrine of adverse domination, the statute of limitations for an entity's claim is tolled when the entity is controlled or dominated by individuals engaged in conduct that is harmful to the entity. *See FDIC v. Jackson*, 133 F.3d 694, 698 (9th Cir. 1998); *FDIC v. Dawson*, 4 F.3d 1303 (5th Cir. 1993); *Farmers & Merchants Nat'l Bank v. Bryan*, 902 F.2d 1520 (10th Cir. 1990); *Shapo v. O'Shaughnessy*, 246 F. Supp. 2d 935, 953 (N.D. Ill. 2002) (citing *Resolution Trust Corp. v. Gallagher*, 800 F. Supp. 595, 600 (N.D. Ill. 1992), *aff'd*, 10 F.3d 416 (7th Cir. 1993)). The doctrine recognizes that officers or directors who have engaged in activities that harm an entity cannot be expected to have brought suit against themselves. *Shapo*, 246 F. Supp.2d at 953; *In re Western World Funding, Inc.*, 52 B.R. 743, 765 (Bankr. D. Nev. 1985) ("Since it can act only through its agents, the corporation is considered to be 'incapacitated' while the wrongdoers are in control, as they cannot be expected to institute an action against themselves."). Under those circumstances, the entity is paralyzed to defend itself against the wrongdoers and the doctrine ensures that the statute of limitations begins to run only once the wrongdoing directors lose control of the entity. *Shapo*, 246 F. Supp. 2d at 953.

The doctrine has been applied in a wide variety of contexts. *See, e.g., Mosesian v. Peat,*

*Marwick, Mitchell & Co.*, 727 F.2d 873, 879 (9th Cir.1984); *Martin Marietta Corp. v. Gould, Inc.*, 70 F.3d 768, 772 (4th Cir. 1995) ("the wrongdoers' control results in the concealment of any causes of action from those who otherwise might be able to protect the corporation"); *Quilling v. Cristell*, 2006 WL 316981 *6 (W.D.N.C. 2006) ("Equitable tolling principles recognize that so long as a corporation remains under the control of wrongdoers, it cannot be expected to take action to vindicate the harms and injustices perpetrated by the wrongdoers."); *Resolution Trust Corp. v. Farmer*, 865 F. Supp. 1143, 1157-58 (E.D. Pa. 1994); *Resolution Trust Corp. v. Gardner*, 798 F. Supp. 790, 795 (D.D.C. 1992); *FDIC v. Howse*, 736 F. Supp. 1437, 1442 (S.D. Tex. 1990).

To date, the Washington courts have not addressed whether the doctrine of adverse domination is recognized under Washington law. In the absence of controlling state authority, this Court must make an "*Erie* guess" as to whether the Washington Supreme Court would adopt the doctrine of adverse domination in this case. *See Byron*, 436 F.3d at 558 (citing *Mayo v. Hartford Life Ins. Co.*, 354 F.3d 400, 406 (5th Cir. 2004)); *Transcontinental Gas Pipe Line Corp. v. Transportation Ins. Co.*, 953 F.2d 985, 988 (5th Cir.1992) ("[I]t is the duty of the federal court to determine as best it can, what the highest court of the state would decide.").

The Receiver argues that the Washington Supreme Court would adopt the doctrine of adverse domination if the question were before it. However, the Carnie Defendants maintain that even if the doctrine were found to apply, it would not apply to a situation like this one, where third parties are sued by the company on whose behalf the suit is brought, even though there is no fiduciary relationship between the two. Consequently, the Court must first resolve whether it should apply the doctrine and then determine whether the doctrine should apply to third parties like the Carnie Defendants and the Danesi Defendants.

The Court concludes that, if asked to rule on the issue, the Washington courts would recognize the doctrine of adverse domination in cases in which directors' control of a corporation reasonably prevented others from discovering the directors' wrongdoing.

As an initial matter, the Washington courts have generally incorporated principles of common law when construing the UFTA. In *Freitag v. McGhie*, 947 P.2d 1186, 1189-90 (Wash. 1997), the Washington Supreme Court recognized that the purpose of the UFTA was to "discourag[e] fraud." In fact, "within the UFTA itself lies a mandate to apply the common law to the extent it is not inconsistent with the provisions of the act." This mandate is expressly stated in Section 19.40.902, which advises that unless otherwise stated, "the principles of law and equity," including the law relating to "fraud," shall supplement the UFTA. *Id.*

Another reason for the Court to believe that the Washington Supreme Court would recognize the doctrine of adverse domination is that the Washington courts have already applied a special rule for tolling statutes of limitations in criminal prosecutions arising out of Ponzi schemes. This suggests that the Washington Supreme Court, for the sake of consistency, would favorably consider a special tolling rule for civil claims arising from a Ponzi fraud.

In *State v. Argo*, 915 P.2d 1103 (Wash. Ct. App. 1996), a Ponzi scheme operator appealed his convictions for securities fraud, arguing in part that the trial court had erred by not limiting the charges against him to transactions that had occurred five years prior to the filing of the information, the period of time corresponding to the statute of limitations for securities fraud. The Washington Court of Appeals affirmed his convictions, holding that the statute of limitations for the crimes had been tolled since the defendant had "lulled" the victims of his fraud into a state of "passive inactivity" by providing them with falsified periodic investment reports and sham interest payments

30

on their investments. *Id.* at 1111. The court found that these activities, "which continued well into the five year statute of limitations period, served to lull the victims, and groom them for future investments in the fraudulent scheme." *Id.* at 1111-12. Consequently, the court found that the lulling doctrine tolled the statute of limitations until Argo ceased his fraudulent activities. *Id.*

Although the lulling doctrine had never been applied by a Washington court prior to *Argo*, the court ruled that it should nevertheless apply the doctrine as a matter of practical necessity. *See id.* Because the Ninth Circuit had applied the lulling doctrine in federal prosecutions for securities fraud, the Court believed that it was appropriate to apply the doctrine in the situation before it. *See United States. v. Brown*, 578 F.2d 1280 (9th Cir.1978).

Yet another reason for the Court to believe that the Washington Supreme Court would apply the doctrine of adverse domination is that various Ninth Circuit cases have recognized the adverse domination doctrine. Like the Fifth Circuit, the Ninth Circuit has recognized that the doctrine of adverse domination applies not only against culpable officers and directors, but also against third parties who are also liable to the plaintiff-entity. *See, e.g., FDIC v. Jackson*, 133 F.3d 694, 698 (9th Cir. 1998) (applying Arizona law); *Mosesian v. Peat, Marwick, Mitchell & Co.*, 727 F.2d 873, 879 (9th Cir.1984); *FDIC v. Dawson*, 4 F.3d 1303, 1308-10 (5th Cir. 1993) (noting that federal district courts have liberally applied the doctrine in favor of government-appointed receivers with many district courts predicting in the absence of controlling state precedent that the states in which they sit would adopt the doctrine).

Additionally, a few courts within the jurisdiction of the Ninth Circuit have already applied the doctrine in the absence of controlling state authority. *See, e.g., Jackson*, 133 F.3d at 698; *United States v. First Nat. Bank & Trust of Wibaux*, 1994 WL 775440 *6 (D. Mont. 1994) ("This Court

believes that the Montana Supreme Court, faced with a situation where an alleged wrongdoer controlled a corporation and thereby prevented the corporation from timely asserting its claims against the wrongdoer, would adopt the doctrine of adverse domination.").

The Court, therefore, applies the doctrine of adverse domination, tolling the statute of limitations until the date of the Receiver's appointment, March 25, 2002. Prior to Warfield's appointment, the receivership entities operated as nothing more than conduits for the RDI fraud under the control of various defendants in the RDI case who fully, completely and exclusively controlled RDI and its affiliated entities. For that reason, it would have been impossible for the receivership entities to have asserted their legal rights before Warfield's appointment since the RDI entities were controlled by the Edwardses and the other perpetrators of the Ponzi scheme.

### 3.    Fraudulent Concealment and the Discovery Rule

The UFTA requires the filing of fraud claims within four years after the transfer was made, "or, if later, within one year after the transfer or obligation was or could reasonably have been discovered by the claimant." Wash. Rev. Code § 19.40.091. UFTA claims are subject to the equitable tolling principles of fraudulent concealment and the discovery rule. *Freitag v. McGhie,* 947 P.2d 1186, 1190 (Wash. 1997). Therefore, a plaintiff must file suit under the UFTA within one year of the date that the plaintiff discovered the fraudulent nature of the transfer. *Id.* at 1190. Further, the doctrine of fraudulent concealment tolls the accrual of a cause of action where an affirmative act conceals the facts underlying the claim, the plaintiff is ignorant of the facts giving rise to the claim, and the plaintiff is diligent in discovering the facts. *Giraud v. Quincy Farm & Chem.,* 6 P.3d 104, 110 (Wash. Ct. App. 2000).

The Carnie Defendants assert that the statute of limitations should have begun to run when the Receiver discovered that PILP and RDI were Ponzi schemes. And certainly the statute of limitations started to run when he became aware of transfers made between the receivership entities and the Carnie Defendants in April 2000.

However, as the Receiver points out, under the discovery rule the action does not begin to accrue until the Receiver discovers the fraud *and the damages*. *First Maryland Leasecorp v. Rothstein,* 864 P.2d 17, 20 (Wash. Ct. App. 1993). There is no evidence in the record that the Receiver knew of the net benefits the Carnie Defendants received until the Receiver was able to take George Carnie's deposition on February 4, 2004. It was then that the Receiver was able to piece together the Carnie's connection with Aruca and Roja. And even then, Mr. Carnie challenged the Receiver's net benefit analysis and claimed that he "just broke even" in his investments with the receivership entities.

The Carnie Defendants also argue that the Receiver's fraudulent concealment theory fails because "there is no evidence that the Carnies or Sandaines had actual or subjective knowledge of the wrongs committed by the Receivership Entities." However, the doctrine of fraudulent concealment in this case does not focus on the Carnies' or Sandaines' actions, but on the actions of the defendants in the underlying lawsuit. *In re William Dec,* 272 B.R. 218, 226 (Bankr. N.D. Ill. 2001); *In re Pomaville,* 190 B.R. 632, 637 (Bankr. D. Minn. 1995).

No genuine issue of material fact exists regarding whether the defendants in the underlying lawsuit fraudulently concealed and destroyed documents. Not only did the defendants use offshore bank accounts and numerous affiliated companies to conceal their fraud, they illegally broke into their offices to steal boxes of documents containing evidence of their fraudulent transfers after the

33

Receiver had taken possession. Because no one questions the fraudulent intent of the underlying defendants, no material issue of genuine fact exists regarding fraudulent concealment.

Of course, in order to benefit from the doctrine of fraudulent concealment, the Receiver must show that he was diligent in discovering the facts giving rise to his causes of action against Defendants. The Court also finds, as a matter of law, that the Receiver was diligent in discovering the claims against the Carnie Defendants and the Danesi Defendants.

The Court assesses the Receiver's diligence objectively. *In re United Ins. Mgmt.,* 14 F.3d 1380, 1385 (9th Cir. 1994). And the Receiver must demonstrate that he conducted a "painstaking investigation." *Freschi v. Grand Coal Ventures,* 767 F.2d 1041, 1047 (2d Cir. 1985), *vacated on other grounds,* 478 U.S. 1015 (1986).

Under this standard, the Court finds no genuine issue of material fact regarding the Receiver's diligence. As the undisputed facts confirm, the Receiver began his investigation on the day he was appointed. He issued subpoenas for 220 bank accounts related to transactions involving over 1,300 investors. He requested and ultimately sought court orders to obtain records from the Bank of Nevis. He conducted an analysis of over 32,500 banking transactions. He instituted numerous ancillary actions on behalf of the receivership, and he ultimately noticed and took the deposition of George Carnie in order to question him about his transactions with PILP and RDI. It was through diligent investigation that the transactions were discovered and then linked to Aruca, Roja, and the Carnies. And then, even in deposition, Mr. Carnie continued to assert that he did not receive funds from the receivership entities in excess of his initial investment. Again, the Carnie Defendants provide no evidence to the Court that the Receiver's mere knowledge of the Ponzi scheme, knowledge of the identities of many of its investors, and knowledge, specifically, that the

Carnies were investors somehow put him on notice that the Carnie Defendants reaped a net profit from their investments.  Instead, that conclusion took more time and further investigation.

Under the doctrines of fraudulent concealment and the discovery rule, the Court finds no genuine issue of material fact concerning when the cause of action accrued.  The Carnie Defendants failed to provide any evidence that the Receiver discovered or should have discovered the fraudulent nature of the transfers *and the resultant damages* prior to February 4, 2004.  Instead, the Carnie Defendants merely make conclusory assertions regarding when the Receiver knew of the facts giving rise to the claims against them.  Under the summary judgment standard, these conclusory assertions are insufficient.  Therefore, the Receiver timely filed suit against the Carnie Defendants as a matter of law.

### E.      Danesi Defendants' Affirmative Defense – Laches

The Receiver has moved for summary judgment on the Danesi Defendants' laches defense. He argues that there is no evidence from which the Danesi Defendants can prove that he "unreasonably[] or inexcusably delayed in filing this lawsuit."  Without citing any evidence, the Danesi Defendants claim, in response, that "[m]aterial fact issues are present at all levels of this case . . . [and] [t]he Receiver should not obtain relief due to his unreasonable delay in asserting a claim."

In Washington, as in most jurisdictions, the equitable doctrine of laches may bar suit when a claimant "unreasonably and inexcusably" delays in filing suit.  *See Edison Oyster Co. v. Pioneer Oyster Co.,* 157 P.2d 302 (Wash. 1945).  To properly invoke the doctrine of laches, a defendant must prove that (1) the plaintiff had knowledge of or could have discovered the facts constituting the cause of action; (2) the plaintiff delayed filing the claim for an unreasonable period of time; and (3)

the defendant was damaged by the delay.  *In re Marriage of Capetillo*, 932 P.2d 691, 695 (Wash. Ct. App.1997).  The party invoking the doctrine of laches bears the burden of proof.  *Rutter v. Rutter's Estate*, 370 P.2d 862 (Wash.1962).

The Danesi Defendants have failed to present any evidence that the Receiver unreasonably or inexcusably delayed in filing suit.  As has already been established in this opinion, the Receiver analyzed thousands of documents to determine where the money that had been invested into the PILP and RDI programs had gone.  Only after conducting those analyses could the Receiver know who to sue to recover the lost money and for how much. Moreover, the Danesi Defendants have not shown how they would be prejudiced if the Court were to permit this action to proceed. The Court finds no genuine issue of material fact regarding the Danesi Defendants' defense of laches. Therefore, their laches defense fails as a matter of law.


**F.       Carnie Defendants' Affirmative Defenses**

In addition to their claims that the statute of limitations bars the Receiver's suit, the Carnie Defendants asserted several affirmative defenses: waiver, estoppel, ratification, fraudulent inducement, negligence, offset proportionate responsibility, and absence of a necessary party. However, the Carnie Defendants presented no arguments and no supporting evidence on these claims in their summary judgment pleadings.  Because the burden of proof is on them to demonstrate that no genuine issue of material fact exists and they are entitled to judgment as a matter of law on their affirmative defenses, these defenses fail as a matter of law.

## III.  CONCLUSION

The Court therefore enters the following rulings:

### A.

With respect to Plaintiff's motion for partial summary judgment against Richard Danesi and Ai-Ki International Establishment (Dkt. No. 159), the Court **GRANTS** Warfield's motion for partial summary judgment on his claim under the Uniform Fraudulent Transfer Act, on the issue of limitations, and in opposition to Defendants' other affirmative defenses.  Accordingly, the Court enters the following rulings:

1.      All Receivership Entities from which Defendants received assets were operated as a fraudulent Ponzi scheme, insolvent from inception;

2.      Defendants failed to transfer reasonably equivalent value in good faith to any Receivership Entity in exchange for the assets received from Receivership Entities;

3.      The transfers Defendants received from the Receivership Entities were fraudulent transfers;

4.      Defendants Danesi and Ai-Ki received, jointly and severally, transfers from the Receivership Entities in the amount of $300,000;

5.      Defendant Danesi, individually, received additional transfers from the Receivership Entities in the net amount of $1,500,015.50, rendering Danesi liable in the total amount of $1,800,015.50;

6.      Limitations on the Receiver's claims against Danesi and Ai-Ki did not begin to run until at least March 18, 2004, because of adverse domination, fraudulent concealment, and the discovery rule; and

7.      No evidence supports Defendants' affirmative defense of laches.

37

**B.**

With respect to Plaintiff's motion for partial summary judgment against George and Deanna Carnie (individually and d/b/a Aruca, Inc.) and Lorie and Randy Sandaine (Dkt. No. 224), the Court **GRANTS** Warfield's motion for partial summary judgment on his claim under the Uniform Fraudulent Transfer Act, on the issue of limitations, and in opposition to Defendants' other affirmative defenses.  The Court **DENIES** Defendants George Carnie (individually and d/b/a Aruca, Inc.), Lorie Sandaine, and Randy Sandaine's motion for summary judgment.

Accordingly, the Court enters the following rulings:

1. All Receivership Entities from which Defendants received assets were operated as a fraudulent Ponzi scheme, insolvent from inception;

2. Defendants failed to transfer reasonably equivalent value in good faith to any Receivership Entity in exchange for the assets received from Receivership Entities;

3. The transfers Defendants received from the Receivership Entities were fraudulent transfers;

4. All transfers made to Aruca by Receivership Entities were fraudulent transfers;

5. Defendants George Carnie and Deanna Carnie received, jointly and severally, transfers from the Receivership Entities in the net amount of $1,117,761.33;

6. Defendants Lorie Sandaine and Randy Sandaine received, jointly and severally, transfers from the Receivership Entities in the net amount of $184,000;

7. Limitations on the Receiver's claims did not begin to run until at least February 4, 2004, for George and Deanna Carnie and March 18, 2004, for Lorie and Randy Sandaine because of adverse domination, fraudulent concealment, and the discovery rule; and

8. No evidence supports the Defendants' affirmative defenses of waiver, estoppel, ratification, fraudulent inducement, offset, proportionate responsibility premised on in pari delicto, negligence, and failure to join a necessary party.

**IT IS SO ORDERED.**

**SIGNED: April 13 , 2007.**

_____
**JUDGE JERRY BUCHMEYER**
**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**